UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELSEY DAVON DANIELS, #787693,

                    Petitioner,                    Case No. 2:17-cv-13003

v.                                                 Paul D. Borman
                                                   United States District Judge
THOMAS WINN,

                    Respondent.
_____/

**OPINION AND ORDER DENYING THE
PETITION FOR A WRIT OF HABEAS CORPUS,
DENYING A CERTIFICATE OF APPEALABILITY, AND
DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I.    Introduction**

This is a habeas case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Kelsey Davon Daniels ("Petitioner") was convicted of first-degree felony murder, Mich. Comp. Laws § 750.316(b)(1), armed robbery, Mich. Comp. Laws § 750.529, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and three counts of possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b, following a jury trial in the Oakland County Circuit Court. He was sentenced, as a third habitual offender, Mich. Comp. Laws § 769.11, to life imprisonment without the possibility of parole on the murder conviction, a concurrent term of 30-60 years imprisonment on the armed robbery conviction, a concurrent term of 4 years 9 months to 10 years imprisonment on the felon in possession conviction,

and concurrent terms of 2 years imprisonment on the felony firearm convictions, to be served consecutively to the other sentences, in 2014.

In his habeas petition, Petitioner raises claims concerning the great weight/sufficiency of the evidence, the jury instructions, the alleged suppression of evidence, and the effectiveness of trial counsel. For the reasons set forth herein, the Court denies the petition for a writ of habeas corpus. The Court also denies a certificate of appealability and denies Petitioner leave to proceed in forma pauperis on appeal.

## II.   Facts and Procedural History

Petitioner's convictions arise from the fatal shooting of Rashone Johnson during an attempted armed robbery at his residence in Pontiac, Michigan during the early morning hours on April 6, 2013. The Court adopts the prosecution's summary of the trial testimony, as set forth on direct appeal, to the extent that it is consistent with the record. Those facts are as follows:

> Susan Allen, a dispatcher with the Oakland County Sheriff's Department (OCSD), testified that she received a 911 call on April 6, 2013 at 12:58 a.m. The 911 tape was played for the jury. (TII, 44) The call indicated that someone had been shot. (TII, 45)
>
> Shay McNeary, a deputy with the OCSD, testified that he received a dispatch call at 12:59 a.m. on April 6, 2013 that there was a shooting victim at the corner of Central and Going in the City of Pontiac. (TII, 47) The shooting victim, Rashone Johnson, was lying on the ground and McNeary did not feel a pulse. (TII, 51) NcNeary and Deputy Haw performed CPR on Johnson, but there was no response and Johnson was

cold to the touch. (TII, 52) EMS arrived and took Johnson to the hospital. Other police officers arrived and followed the blood trail. (TII, 53) McNeary found a golf ball size of crack cocaine in a bag at the scene. (TII, 54-55)

Kevin Braddock, a deputy with the OCSD, testified that he arrived at the scene and saw Johnson lying on the ground and unresponsive to the CPR. Johnson's blood soaked pants were down and his boxers were visible. (TII, 62) Braddock went to the hospital and Johnson was pronounced dead. Braddock stayed with Johnson and his property. There was some blood soaked money in Johnson's boot. (TII, 66) Braddock transported Johnson's items to Rachel Grace, the crime scene investigator. (TII, 67) Braddock did not count the money because it was blood soaked. (TII, 68)

Donald Gracey, Jr., a deputy with the OCSD, testified that he arrived at the intersection of Central and Going Street and observed Johnson laying on the ground. Johnson was a black male and his pants were down around his thighs and he was covered in blood. There was also a small bag of what appeared to be cocaine and a blood trail that led down the sidewalk. (TII, 71-72) Gracey followed the blood trail to a house one block away at 424 Irwin Street. (TII, 74-79) There was a Chevy Suburban in the driveway. (TII, 81) Gracey did not recall if the front door was locked. (TII, 100) Deputies entered the home through the open side door. (TII, 84-85) The television in the living room was on. Gracey observed a shell casing from a semi-automatic handgun in front of the stove and another casing was in the sink. (TII, 86-87, 94) Blood was found in the living room. (TII, 102-103)

Rachel Grace, a forensic lab technician with the OCSD, was qualified by the court as an expert in crime scene investigation and tool mark and firearms identification. (TII, 106) Grace went to 424 Irwin Street and took photos of the scene and collected evidence. Grace collected a comb that was on the front walk. (TII, 111) The DNA on the comb matched Johnson's DNA. (TII, 112) The main portion of blood was found to the side of the couch and just inside the front door. (TII, 113) No guns were recovered in this case so Grace could not compare the casings to any particular gun. (TII, 115-116) Grace concluded that the casings were fired from a .9 mm gun manufactured by either Ruger or Smith and

Wesson. (TII, 116) There was also a .45 automatic caliber casing found, indicating that two automatic revolver guns were involved. (TII, 121-122) The two .45 caliber casings came from the same firearm. (TII, 126-127)

Grace received Johnson's clothes and money in a bag. (TII, 130-131) There was $111.00 total. (TII, 135) There was a hole consistent with a fired projectile in the left pocket and another in the right pocket [of Johnson's pants]. There was also a projectile hole in Johnson's hoodie across the abdominal area consistent with a graze mark. (TII, 130-132) Grace followed the blood trail and found a silver necklace on the sidewalk at the west side of 410 Central. (TII, 134) A small clear bag with suspected drugs was also found near Johnson's body. (TII, 136)

On April 8, 2013, Grace processed evidence from a 2000 blue Malibu car related to this incident. No latent prints were recovered from the vehicle. (TII, 140, 146) Grace found a small amount of blood on the front passenger interior handle. The blood matched the DNA profile for Rickey Smith. (TII, 146-147)

Nathaniel Goss, a paramedic with Starr EMS, testified that he was dispatched to Central and Going Street on April 6, 2013 at approximately 1:03 a.m. There was a lot of blood on the scene and likely an artery was hit and the patient was bleeding out. They loaded the patient into the ambulance immediately. (TII, 185-188) There were no signs of life. (TII, 191) When Goss pulled the patient's right boot off, blood "just poured all out of his boot." There was money folded inside the boot with the blood. (TII, 193-195)

Ruben Ortiz-Reyes, a forensic pathologist with the Oakland County Medical Examiner's Office, was qualified by the court as an expert in forensic pathology and pathology. (TII, 204) Ortiz-Reyes performed the autopsy on Johnson on April 6, 2013, at 8:00 a.m. (TII, 206) Johnson was 5'8", 216 pounds, and was 29 years old. (TII, 207) There was a gunshot wound to the left thigh and a gunshot wound to the right thigh of Johnson's legs. (TII, 211) The left gunshot wound went through the femoral artery and femoral vein—the biggest vessels. (TII, 217) A person walking with that type of injury is going to lose a lot of blood. Ortiz-Reyes opined that it would take only minutes to bleed out. (TII,

220) The gunshot wound on the right thigh only damaged the femoral artery, not the vein. (TII, 221) Ortiz-Reyes concluded that the manner of death was homicide caused by multiple gunshot wounds. (TII, 227)

Allante Thompson identified Defendant in court as the person he knew as Kelsey Daniels. Thompson was involved in the whole situation and was not happy to be in court. (TIII, 6) Thompson knew Rickey Smith, who went by the name of "Boss," for a long time. Thompson knew Charona Williams not that long. Thompson had known Defendant for "almost forever." (TIII, 7) Thompson knew Ricky Larkin and had been to his apartment on Walton in Pontiac. (TIII, 8) Thompson drove Larkin's Malibu in the early morning hours of April 6, 2013. (TIII, 9-10) Thompson went to Larkin's apartment on Friday, April 5, 2013, in the afternoon and he was drinking and smoking marijuana. (TIII, 12-13) Two girls were at the apartment—Simone was with Ricky and Mayia was there alone. Defendant and Smith were also there. (TIII, 14-16)

Around midnight, Smith asked Thompson to drive him in Larkin's car to pick up his girlfriend because Smith did not have a driver's license. (TIII, 19) Smith told Thompson to drive to the "east side" near Murphy Park. (TIII, 20) When they were on Irwin Street, Smith was on his phone and said, "I'm here." (TIII, 25) The house they went to was at the intersection of Going and Irwin. (TIII, 26-27) Thompson saw Williams near the sidewalk of 424 Irwin. (TIII, 28-29) Williams sat in the back seat and Smith and Kelsey got out of the car and said they would be right back. Thompson did not think anything of it. (TIII, 31-32)

Thompson heard what sounded like a car crash to him and Williams panicked and jumped out of the car. She went running up the sidewalk. (TIII, 33-34) Thompson saw a person moving towards Going Street. (TIII, 35) Williams, Defendant, and Smith returned to the car. Defendant was wearing his hoodie up and tied. (TIII, 36-38) Smith hit Williams a couple of times and said, "I told you." Defendant told Smith to stop. Thompson asked what was going on and Defendant told him not to worry about it. (TIII, 39-41) Smith told Thompson to drive back to Larkin's home. Smith was acting nervous, but Defendant acted normal. (TIII, 42) Police cars went flying past them at the corner of Martin Luther King and Auburn Road. (TIII, 43) Smith told Thompson to get off the main street, but Thompson continued straight. (TIII, 44)

Thompson stopped on Dufrain Street for Williams to see some girl named "Tick," but no one answered the door. (TIII, 48) Thompson drove to Williams's brother's house and dropped off Williams and Smith. (TIII, 51-52)

Thompson and Defendant returned to Larkin's apartment. (TIII, 54) A guy named Tremaine Love was there. (TIII, 55-56) Thompson and Larkin went to the Coney Island from approximately 2:00 a.m. until 3:00 a.m. (TIII, 57-60) Thompson, Larkin, Defendant, and Love made small talk at the apartment for approximately an hour and then Williams and Smith arrived at approximately 4:00 a.m. (TIII, 62-63) Thompson was smoking marijuana. (TIII, 64) Defendant showed Thompson his cell phone and it said, "I think that's messed up, what happened, RIP Shone Rone." To Thompson, it meant that Johnson had died. (TIII, 65)

Defendant told Thompson that he had nothing to worry about because he did not know what was going on. (TIII, 67) Defendant told Thompson that Smith went in first through the side door and he had a .45 gun on him. Defendant had a .9 gun on him. There was a struggle between Smith and Rashone and Defendant shot one time towards Rashone's stomach or chest area. (TIII, 67-69) Smith said he shot towards the ground and made two "pow" noises. (TIII, 71-72) Defendant said they went there for a "lick." Thompson explained that "lick" is a street word for robbery. (TIII, 70) Defendant went there for a "band" which meant a thousand dollars. Williams texted Smith that Rashone had a band. (TIII, 71) Thompson's mother and Rashone's oldest brother grew up together. Thompson did not want his mother to know he "took somebody on something like this." (TIII, 74) In the morning, Thompson took Williams to Tick's house and Smith to Canterbury Street and then he went to class at 8:00 a.m. (TIII, 76-79)

On Sunday, Thompson got arrested. Thompson lied and told the detectives that he did not know why he was there and that he had not seen Defendant or Smith all week. (TIII, 81-84) Thompson did not want to be a "snitch" and did not want his mother finding out. (TIII, 84-86) Thompson went to his mother's house and shortly afterwards, the detectives arrived there. Larkin told the detectives that he gave the car keys to Thompson, Smith, and Defendant and had not seen the car in 24 hours. Thompson denied it and the detectives left. (TIII, 88-89)

Thompson's mother kicked him out of the house and he went to a friend's house. Thompson's mother hired a lawyer, William Hatchett, and they went to speak with him. (TIII, 90-92) Thompson lied to Hatchett because his mother was there. (TIII, 92)

The next day the detectives went to Thompson's mother's house and told her that they knew for a fact that Thompson was the one driving the car. Thompson went back to Hatchett's by himself and told him the truth. (TIII, 92-93) Thompson spoke with the police on May 24, 2013, with Hatchett present. (TIII, 95-96) The prosecutor was present and they all signed an agreement. The agreement stated that Thompson's statement could not be used against him in court, unless he committed perjury. (TIII, 97-98)

Charona Williams identified Defendant in court as the person she knew as Kelsey Daniels. (TIII, 160-161) Williams dated Smith for approximately a year. Williams knew Rashone Johnson and had a sexual relationship with him also. (TIII, 161-162) Williams had been to Johnson's house at 424 Irwin Street numerous times. (TIII, 163) Williams stated that she had an agreement with the prosecutor's office that in exchange for her truthful testimony, she pled guilty and would be sentenced to the charge of conspiracy to commit armed robbery and the charges of felony murder and armed robbery would be dropped. (TIII, 164) The charge of conspiracy to commit armed robbery carried a sentence of a minimum of ten and a half years in prison. (TIII, 165)

At the time of the murder, Williams was eighteen years old and lived with her mother in Troy, Michigan (TIII, 165-166) On April 6, 2013, at approximately 5:00 a.m., Williams' mother called her and told her the police were at the house. Williams was at Larkin's apartment with Smith, Defendant, Tremaine Love, Ricky Larkin, and Allante Thompson. (TIII, 166-167) Williams told Smith that she wanted to go to her friend Tick's house and Thompson drove her there. (TIII, 168-169) Williams was upset and crying. Williams told Tick that Smith killed Shone. Williams called her mother to come and get her. Williams went right from Tick's to the police station. (TIII, 169-170)

On Friday, April 5, 2013, Williams was at Tick's house and Smith's mother dropped off a bag of clothes for Williams to give to Smith. (TIII, 179-180) Williams called Smith to let him know. Williams was planning to spend the night at Johnson's place. (TIII, 181) Tick drove Williams to

Ricky Larkin's place at approximately 10:00 or 11:00 p.m. (TIII, 183) Williams got into an argument with Smith and returned to Tick's house. (TIII, 184) Williams texted Smith at 10:14 p.m., "Bag in the parking lot. I'm done." Smith went to Tick's house looking for Williams, but Tick's cousin told Smith she was not there. (TIII, 188-189) Williams texted Johnson that she needed to stay at his place for the night. (TIII, 189-190) At approximately 11:41 p.m., Johnson texted Williams that he was pulling up at Tick's house. (TIII, 196)

Johnson picked up Williams and they stopped on Wilson Street for Johnson to sell drugs. (TIII, 196-197) Johnson stopped at a Sunoco gas station to get some Halls throat lozenges and then they went to Johnson's house on Irwin Street. Williams began to braid Johnson's hair. At 12:14 a.m. on April 6, 2013, Williams texted Smith, "I got a lick for you." (TIII, 197-200) Williams explained that she was telling Smith to come to Johnson's to rob him. Williams did not know why she did that. Smith texted Williams, "Bitch answer the phone." (TIII, 200) Williams texted Smith, "Stretch this nigger he got more than a band." Williams explained that her text meant to lay Johnson on the ground and take his money. A band was a thousand. Williams assumed that Johnson had that kind of money because he was a drug dealer, but did not see any money and did not know where Johnson kept his money. (TIII, 202-203)

Williams texted Smith, "I'll come outside and act like you my ride and they you come on in." (TIII, 203) At 12:23 a.m., Williams texted Smith, "In the car with Tick and Shone. I'm going to go to Irwin, he drunk." Williams explained that the text was a lie because she did not want Smith to know that she was alone with Johnson at his house. (TIII, 205) At 12:28 a.m., Smith texted Williams, "Go in the crib. And see who there. What I'm pulling up." Williams texted, "K I'm on my way there now," still pretending that she was not at Johnson's house. (TIII, 208) Williams texted her sister Shaee, "I need you to call right now and say I'm on my way please," so that Johnson would think she was walking out to her sister. (TIII, 209-210) At 12:43 a.m. Williams texted Smith, "Hurry babe, please."

Williams walked out to the street and saw Thompson pulling up. Williams left the side door unlocked. Williams got in the car and Defendant was in the back seat and Smith was in the front passenger

seat. (TIII, 211, 214) Williams asked, "Who is that?" because Defendant had a hood on and she did not recognize him. Williams told Smith that Johnson was alone and there may be a gun under the sofa cushion. (TIII, 215-216) Smith asked for something to cover his face and Williams gave him a white t-shirt. Smith and Defendant got out of the car and went towards the house. Williams knew that Defendant and Smith were armed. (TIII, 217-218)

Not even a minute later, Williams heard gunshots. She said, "Oh shit" and jumped out of the car and started running away from Irwin because she was scared. Williams thought that Smith and Defendant were going to just rob Johnson and she did not want anybody to shoot him. (TIII, 219-220) Thompson drove up and Smith was in the front seat making gestures and mouthing, "What the fuck?" Williams got in the car and Smith turned around and threw a couple of punches at Williams with a closed fist. Defendant told Smith to stop because he was scaring her. Smith stopped and turned around. (TIII, 221-222)

They drove to Martin Luther King and Auburn and Smith told Thompson to take side streets. Williams saw approximately three sheriff's vehicles with their sirens and lights on heading the way they just came from. Defendant said, "We need to get these guns out the car." (TIII, 223-224) Williams told Thompson to drop her off at the Woodcrest Apartments because her brother, Will Terry, lived there. Williams and Smith went inside Terry's apartment and Smith hid his gun under the seat cushion. Williams observed that the gun was black and big. (TIII, 225-227) Williams noticed there was blood on the white t-shirt she had given Smith. Williams took the shirt and threw it over the side of her brother's gate where there was a Popeye restaurant. (TIII, 227-228) Smith was jealous about Johnson and said, "If I got it in my mind that you was about to fuck that nigger I'll kill you or hurt you." (TIII, 228-229)

At approximately 4:00 a.m., Terry took Williams and Smith to Larkin's apartment. (TIII, 232) When they arrived, Defendant, Love, Thompson, and Larkin were there. Smith still had his gun. Williams called her mother to pick her up and her mother told her she would be there in the morning. (TIII, 233-234) Smith and Defendant left the room for a few minutes and then Smith returned. Five minutes later, Larkin came in the

bedroom and put two guns in the closet on the top shelf. (TIII, 235) Smith's gun was a semi-automatic. (TIII, 236) One of the two guns looked like the gun at Terry's house. (TIII, 237)

At approximately 5:19 a.m., Williams got a text from her friend Tanisha that said, "Rashone gone, I'm crying." Williams was shocked. (TIII, 237-238) Smith read the text and did nothing at all. (TIII, 239) Five minutes later, Williams' mother called her to tell her the police were at her house. (TIII, 239) Williams told her mother that she was on the north side and would call her later because she was scared to talk to the police. (TIII, 240) Smith told Thompson that Williams wanted to leave and Defendant told Williams to take the battery out of her phone. Defendant also asked Williams if she was texting Johnson prior to this and to tell the police that she did not know anything. (TIII, 242-243) Thompson took Williams to Tick's house and Thompson left with Smith in the car. (TIII, 244)

Williams' mother picked her up and she went to the Pontiac Police Department. Detectives Emmons and Miller questioned Williams. (TIII, 245) Williams had been in police custody ever since that day. (TIII, 246) Williams never communicated with Thompson since the incident. (TIII, 247) Williams gave the police several statements over three days. (TIII, 250-251) Williams decided to cut a deal when she was charged with murder and the police had obtained Williams' text messages. (TIII, 251-252)

Williams did not feel bad about setting Johnson up, but she did feel bad that he was deceased. (TIII, 253) Williams had a prior conviction for retail fraud third degree. (TIII, 271) Williams admitted that everything in her first and second statements to the police were basically lies. (TIII, 277)

Adam Miller, a detective with the OCSD, testified that he spoke with Williams on April 6, 7, and 8, 2013. After speaking with Williams on Sunday, April 7, Miller went to the Wingsong Apartments where Ricky Larkin lived because they had information about the blue Malibu that may be involved in the homicide. Miller located the Malibu in the parking lot of 1300 block of Gambrell. (TIII, 284) Miller and Emmons watched the car and an hour later, Thompson got in the car and left. A

marked police car stopped the Malibu. An inventory search of the Malibu was performed and the car was sent to the impound lot. Larkin later consented to a search of the vehicle and a crime scene technician went over the car. (TIII, 285-287) No guns were ever recovered in this case. (TIII, 289) Larkin's apartment was never searched because the police did not obtain information about possible guns at the apartment until months later. (TIII, 300-302) The police looked for Defendant everywhere and they were not able to find him until June 10, 2013. (TIII, 310-311; TIV, 12-14) Defendant was in custody in the Wayne County Jail. (TIV, 17)

Chad Emmons, a detective with the OCSD, testified that he received an anonymous tip regarding Charona Williams setting up the murder on April 6, 2013, at approximately 3:00 a.m. (TIV, 21) Emmons found out that Williams was dating Johnson. He went to Williams' mother's house in Troy to speak with her and Williams subsequently went to the substation sometime after 8:00 a.m. (TIV, 22-25)

The People rested. (TIV, 30)

Ricky Larkin testified that he was 22 years old and lived in his mother's apartment on April 6, 2013. Larkin knew Defendant from school. (TIV, 31-32) On the evening of April 5, 2013, Larkin was at the apartment with his girlfriend, Simone Brown, her cousin Jamia, Jermaine, and Thompson. Defendant was not there. (TIV, 33) Larkin let Thompson use his car because Thompson did not want to be a third wheel. Thompson left a little before 10:00 p.m., which was before the ladies arrived. (TIV, 34)

Thompson came back alone around 12:00 or 1:00 a.m. and no one other than Larkin was at the apartment. Larkin went with Thompson to the Coney Island from approximately 2:00 a.m. until 3:00 a.m. and then they returned to Larkin's apartment. (TIV, 35-36) Larkin spoke with Detective Miller on April 8, 2013 for an hour and then he was let go. (TIV, 37-38)

Larkin denied that Smith ever asked him for a ride early on Saturday morning, April 6, 2013. Larkin was impeached with his statement dated April 7, 2013 to Detective Emmons that stated, "He called me Saturday

11

morning for a ride, but I was busy with my cousin." Larkin stated that he did not recall Smith calling him. (TIV, 42-43) However, Larkin mentioned Smith calling him on Saturday morning at least four times in his statement. Larkin stated that he did not recall talking to him. (TIV, 46-48) Larkin was sure that Smith was not at his apartment asking to use the car with Defendant and that he let Thompson use the car and the three of them left. (TIV, 49-50)

Larkin did not recall Defendant's mother calling to tell him about Johnson's killing. (TIV, 51) However, Larkin's statement to police on April 7, 2013 stated that Defendant's mom "was the one who actually called me and told me about everything." (TIV, 51-52) Larkin testified that his girlfriend arrived after Thompson left, but his statement to police said, "It was me, him and another female and he didn't want to be sitting around while we was there." (TIV, 68) Larkin could not recall if Williams stayed at his apartment on Thursday night. Larkin saw Smith and Defendant on Friday earlier in the day. (TIV, 69-70) Larkin had no idea how much weed he smoked that night. (TIV, 72) Larkin did not like talking to the police. (TIV, 73)

The defense rested. (TIV, 79) Defendant chose not to testify. (TIV, 81-82)

Pros. App. Brf., pp. 1-14.

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals essentially raising the same claims presented on habeas review. The court denied relief on those claims and affirmed his convictions and sentences. *People v. Daniels*, No. 324565, 2016 WL 1125939 (Mich. Ct. App. March 22, 2016). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Daniels*, 500 Mich. 882, 886 N.W.2d 439 (2016).

Petitioner thereafter filed his federal habeas petition raising the following claims:

I.     The great weight of the evidence was insufficient to sustain the verdict and the Michigan Court of Appeals' decision affirming his convictions was contrary to or an unreasonable application of clearly established federal law.

II.    The jury instructions were improper and deprived him of a fundamental right to due process and his defense counsel was ineffective for failing to timely object.

III.   The prosecution violated his constitutional right to a fair trial when it suppressed evidence that it had a duty to disclosed and such violation of *Brady v. Maryland*, 373 U.S. 83 (1963), was not immaterial but substantial.

IV.    Trial counsel was ineffective for failing to conduct a thorough investigation and present an adequate defense.

Respondent filed an answer to the habeas petition contending that it should be denied because certain claims are procedurally defaulted and all of the claims lack merit. Petitioner filed a reply to that answer, as well as a subsequent amendment providing additional argument in support of his petition.

## III.   <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions. The AEDPA provides in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103; *see also White v. Woodall*, 572 U.S. 415, 419-20 (2014). Federal judges "are required to afford state courts due

respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 123 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. at 71-72. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of clearly established law are to be determined solely by Supreme Court precedent. Thus, "circuit precedent does not constitute 'clearly established Federal law as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003) and *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002)).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

## IV.   Analysis

### A.   Procedural Default

As an initial matter, Respondent contends that habeas claims are barred by procedural default. The Court declines to address this procedural defense. It is not a jurisdictional bar to review of the merits. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). Moreover, federal courts on habeas review "are not required to

address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The Supreme Court has explained the rationale behind such a policy: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525.

Such is the case here. The procedural issues are complex and the substantive claims are more readily decided on the merits. Accordingly, the Court shall proceed to the merits of Petitioner's claims.

### B.   Merits

#### 1.   Great Weight/Insufficient Evidence Claim

Petitioner first asserts that he is entitled to habeas relief because the verdict was against the great weight of the evidence and the prosecution failed to present sufficient evidence to support his convictions for felony murder and armed robbery. Respondent contends that this claim lacks merit.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation and footnote omitted). The sufficiency of the evidence standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *Jackson*, 443 U.S. at 324 n. 16, and through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence must survive "two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Additionally, "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). A federal court may not re-weigh the evidence or re-determine the credibility of the witnesses. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). A habeas court must defer to the factfinder at trial for its assessment of the credibility of witnesses. *Id.*

Under Michigan law, a person who commits murder during the perpetration of a felony is guilty of first-degree murder. Mich. Comp. Laws § 750.316(b). The

elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in the statute. *See Matthews v. Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003) (citing *People v. Carines*, 460 Mich. 750, 759 (1999)); *People v. Smith*, 478 Mich. 292, 318-19 (2007). The facts and circumstances of the killing may give rise to an inference of malice, including evidence that the defendant used a deadly weapon. *Carines*, 460 Mich. at 759.

Armed robbery is an enumerated felony under the statute. The elements of armed robbery are that the defendant: (1) in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. *People v. Chambers*, 277 Mich. App. 1, 7-8 (2007); Mich. Comp. Laws §§ 750.529, 750.530.

To convict a defendant under an aiding and abetting theory, a prosecutor must show that: (1) the crime charged was committed by the defendant or some other

20

person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or knew that the principal intended to commit the crime at the time he or she gave aid and encouragement. *Carines*, 460 Mich. at 757-58; *see also People v. Robinson*, 475 Mich. 1, 6, (2006); Mich. Comp. Laws § 767.39. An aider and abettor's state of mind may be inferred from all the facts and circumstances, including a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime. *Carines*, 460 Mich. at 757-58.

As with any crime, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offenses. *People v. Oliphant*, 399 Mich. 472, 489 (1976); *People v. Yost*, 278 Mich. App. 341, 356 (2008); *People v. Kern*, 6 Mich. App. 406, 409 (1967). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *People v. Nowack*, 462 Mich. 392, 399-400 (2000); *People v. Jolly*, 442 Mich. 458, 466 (1993), including the identity of the perpetrator, *Dell v. Straub*, 194 F. Supp. 2d 629, 647-48 (E.D. Mich. 2002); *Kern*, 6 Mich. App. at 409, and intent or state of mind. *People v. Dumas*, 454 Mich. 390, 398 (1997).

Citing the *Jackson* standard and the foregoing state law principles, the Michigan Court of Appeals ruled that the prosecution presented sufficient evidence

to support Petitioner's convictions for felony murder and armed robbery. The court

explained in relevant part:

> Defendant's claim that his conviction(s) cannot stand because "nothing
> was taken," and therefore no robbery occurred, is without merit. The
> felony murder statute specifically states that the murder need only have
> occurred during the "attempt to perpetrate" one of the enumerated
> felonies. MCL 750.316(1)(b). Moreover, under the Legislature's armed
> robbery statute, MCL 750.530, "a completed larceny is no longer
> necessary to sustain a conviction for the crime of robbery or armed
> robbery." *People v. Williams*, 491 Mich. 164, 166; 814 NW2d 270
> (2012).
>
> * * *
>
> The evidence supports the conclusion that defendant committed armed
> robbery as either a principal or an aider and abettor. Charona Williams
> testified that she texted Rickey Smith from Johnson's house and told
> Smith that she had a "lick" for him. Allante Thompson then drove Smith
> and defendant to Johnson's house. According to Williams, defendant
> had his hood tied around his head, and she gave Smith a white t-shirt to
> put over his face. She warned Smith that Johnson might have a gun
> under a cushion in the house. Both Williams and Thompson testified
> that defendant and Smith then got out of the car and entered Johnson's
> house. Not a minute later, Williams heard gunshots,[1] and Smith and
> defendant came out of the house and back into the car. Later that
> morning, defendant and Smith told Thompson that they had gone into
> Johnson's house to rob him and that while there, they all got into a tussle
> and defendant fired one shot upwards toward Johnson's stomach or
> chest, and Smith fired two shots toward the ground. Thompson further
> testified that defendant told him that he used a 9–mm gun and Smith
> used a .45–caliber gun. Johnson ended up dying as a result of being shot
> multiple times.
>
> From this evidence, the inescapable inference is that defendant and
> Smith both entered Johnson's house to steal money from him. Defendant
> attempted to conceal his identity before entering Johnson's home and
> admitted afterward that it was intention to rob Johnson. Further,

---

[1] Thompson testified that he heard what sounded like a crash.

defendant admitted that he had a 9–mm gun and fired it during the robbery attempt. Alternatively, at a minimum, the evidence supports the finding that defendant aided in the commission of the attempted robbery with knowledge at the time that Smith intended to rob Johnson.

Defendant also challenges the sufficiency of the evidence in support of his felony-murder conviction on the basis that he did not possess the requisite malice for felony murder. Malice may be inferred "from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Carines*, 460 Mich. at 759.

Here, there was evidence that defendant entered Johnson's home with a 9–mm gun and fired it at Johnson. The fact that the shot missed during the struggle does not negate the intent that defendant had at the time. The jury was still free to infer that defendant had at the time an intent to kill or cause great bodily harm from his use of the firearm. *See id*. ("Malice may also be inferred from the use of a deadly weapon.").

Alternatively, the evidence was also sufficient for a rational jury to find that defendant had the requisite malice to be convicted of felony murder under an aiding and abetting theory.

\* \* \*

. . . like before, defendant's use of a firearm could allow the jury to infer the requisite malice. *See Carines*, 460 Mich. at 759. Further, . . . [a] natural and probable consequence of armed robbery, the crime defendant either committed as a principal or aided and abetted, is death or great bodily harm. Thus, there was sufficient evidence that defendant "wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm."

*Daniels*, 2016 WL 1125939 at \*1-3 (footnote in original).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. As an initial matter, Petitioner is not entitled to habeas relief on any claim that the jury verdict was against the great weight of the evidence. It is well-established that habeas review is not available to

correct errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). The federal constitution requires only that the evidence be sufficient to sustain the conviction under the standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979). Where the evidence is sufficient as a matter of due process, a claim that the verdict was against the weight of the evidence presents a state law issue which is not cognizable on habeas review. A federal habeas court has no power to grant relief on the ground that a state conviction is against the great weight of the evidence. *Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002). Habeas relief is thus not warranted on such a basis.

Similarly, to the extent that Petitioner contests the Michigan Court of Appeals' interpretation of state law regarding the elements of the offenses, he is not entitled to relief. It is well-settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). Habeas relief does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67-68.

With respect to the sufficiency of the evidence under the *Jackson* standard, the record indicates that the prosecution presented sufficient evidence to establish that Petitioner committed first-degree felony murder and armed robbery and that he acted with the requisite intent to support his convictions. The testimony of Allante Thompson and Charona Williams, and reasonable inferences therefrom, establish that Petitioner was one of the perpetrators of the crimes, either as a principle or as an aider and abettor, that Petitioner went to the victim's house with his cohort, Ricky Smith, intending to rob the victim of money, that Petitioner and Smith were both armed with guns and made efforts to conceal their identities, that Petitioner fired his weapon at the victim and Smith also fired his weapon during the robbery attempt, and that the victim died from a gunshot wound that he suffered during the incident.

Petitioner challenges the credibility determinations and inferences the jury drew from the testimony presented at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve such evidentiary conflicts. *Cavazos*, 565 U.S. at 7; *Jackson*, 443 U.S. at 326; *Martin*, 280 F.3d at 618; *see also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). The jury's verdict was supported by the trial testimony. The evidence presented at trial,

viewed in a light favorable to the prosecution, established beyond a reasonable doubt that Petitioner committed the crimes, either as a principle or as an aider and abettor, and that he acted with the requisite intent to support his convictions. More importantly, for purposes of federal habeas review, the Michigan Court of Appeals' decision to that effect was reasonable. Habeas relief is not warranted on this claim.

### 2. Jury Instruction Claim and Related Ineffective Assistance of Counsel Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in instructing the jury by failing to instruct on M. Crim. JI 2.19 (multiple defendants on trial together), failing to instruct on M. Crim. JI 8.5 (mere presence), and failing to instruct on the lesser offense of voluntary manslaughter. Petitioner relatedly asserts that trial counsel was ineffective for failing to object to the jury instructions at trial. Respondent contends that the jury instruction claim is waived/procedurally defaulted and that the claims lack merit.

In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than the instructions are undesirable, erroneous or universally condemned. Rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *Estelle*, 502 U.S. at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable

likelihood that the jury applied the instruction improperly. *Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999). A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Jones v. United States*, 527 U.S. 373, 391 (1999); *Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996). The failure to give an instruction that is supported by the evidence does not automatically justify habeas relief – the failure to instruct must have rendered the trial fundamentally unfair. *Henderson*, 431 U.S. at 155 ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."). State law instructional errors rarely form the basis for federal habeas relief. *Estelle*, 502 U.S. at 71-72.

The Michigan Court of Appeals ruled that Petitioner waived any review of the jury instructions because defense counsel expressed satisfaction with the instructions as given. The court nonetheless further ruled that the claims of instructional error lacked merit because the instructions were not warranted based upon the evidence presented at trial. The court explained:

> Defendant avers that the court erred because it failed to provide the instruction provided in M. Crim. JI 2.19. This instruction provides that when there are multiple defendants "on trial together," the jury is to consider each of them separately and is to decide the case based on the evidence and the law that applies to each defendant. However, while there were other individuals who pleaded guilty related to the murder of Johnson, defendant was the sole defendant on trial. Thus, it would have been nonsensical and improper for the court to provide this instruction.

Defendant also claims that the jury should have been instructed on M. Crim. JI 8.5, which provides that mere presence, even with knowledge that an offense is about to be committed, is insufficient to make that person liable on an aiding and abetting theory. But in order to give a particular instruction to the jury, there must be evidence to support it. *People v. Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000); *People v. Johnson*, 171 Mich App 801, 804; 430 NW2d 828 (1988). Here, the evidence shows that defendant was more than just a mere bystander. Instead, the evidence demonstrates that he wielded a gun, attempted to conceal his face with a hood, entered Johnson's home with Smith, and fired his gun toward Johnson. As a result, the evidence did not support providing M. Crim. JI 8.5 to the jury.

Defendant alleges that the jury should have been instructed on the lesser offense of voluntary manslaughter. "Voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation and before a reasonable time has passed for the blood to cool." *People v. Hess*, 214 Mich App 33, 38; 543 NW2d 332 (1995). However, there was no evidence presented that purported to show that defendant was, at the time of the killing, acting "under the influence of passion or hot blood produced by adequate provocation." Rather, the evidence established that this was a planned robbery attempt. Thus, the jury was not entitled to be instructed on voluntary manslaughter. *See Canales*, 243 Mich App at 574; *Johnson*, 171 Mich App at 804.

*Daniels*, 2016 WL 1125939 at \*3-4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The instruction on multiple defendants was not warranted because it only applies to multiple defendants tried together in one trial. In this case, the other defendants, Smith and Williams, pleaded guilty, and Petitioner was tried alone. The instruction on mere presence was not warranted because, as discussed *supra*, there was ample evidence that Petitioner was

28

an active participant in the crime, not merely present when it occurred. The instruction on voluntary manslaughter was not warranted because the evidence indicated that the fatal shooting occurred during a planned robbery attempt, not in response to adequate provocation and in the heat of passion. Petitioner fails to show that a state law error occurred, let alone one of constitutional dimension, as to this issue. The jury instructions, as given, adequately informed the jurors of the elements of the crimes, the burden of proof, and the proper consideration of the evidence. The omission of the aforementioned instructions did not render the trial fundamentally unfair. Habeas relief is not warranted on this claim.

Petitioner relatedly asserts that trial counsel was ineffective for failing to object to the jury instructions at trial. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id*. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id*. On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Id.* at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal and end citations

omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

Given the Michigan Court of Appeals' decision and this Court's decision that the jury instructions were appropriate under state law and did not render the trial fundamentally unfair, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct.[2] Counsel cannot be deemed ineffective for failing to make a futile or meritless objection. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2014) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."); *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000). Habeas relief is not warranted on this claim.

### 3.    Non-Disclosure of Evidence Claim

Petitioner also asserts that he is entitled to habeas relief because the prosecution failed to disclose evidence – police reports containing statements from Samone Brown, Jamya Abrams, and Danny Wallace (and his son) – in violation of his constitutional rights. Respondent contends that this claim is procedurally defaulted and that it lacks merit.

The United States Supreme Court has made clear that prosecutors must "refrain

---

[2]Petitioner did not raise this particular claim of ineffective assistance of counsel in the state courts. Accordingly, the Court's review of this issue is de novo.

from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To find a *Brady* violation, not only must the evidence be suppressed, it must be material and favorable to the defense. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985). Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432–36 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993). The duty to disclose favorable evidence includes the duty to disclose impeachment evidence. *Bagley*, 473 U.S. *at 682*; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A *Brady* violation does not occur if the defendant knew or should have known the essential facts or if the evidence is available from another source. *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004); *Coe v. Bell*,

161 F.3d 320, 344 (6th Cir. 1998). A *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure. *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986).

Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of guilt. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). The petitioner bears the burden of establishing a *Brady* violation. *Id.*

The Michigan Court of Appeals denied relief on this claim ruling that Petitioner failed to establish a *Brady* violation. The court explained in relevant part:

> Defendant asserts that the witness statements from three witnesses (Samone Brown, Jamya Abrams, and Danny Wallace) are implicated in this claim. However, notably, defendant never alleges that the prosecutor failed to disclose the statements from Brown and Abrams. Instead, defendant cursorily avers that the statements from them "directly contradict the testimony" of other witnesses because "they refute the assertions of his presence at Ricky Larkin's apartment." Thus, without any evidence that the prosecutor had possession of these statements and did not turn them over to defendant, defendant cannot establish plain error. Moreover, the statements did not materially help defendant. The statements merely provide that, according to these witnesses, defendant was not at Larkin's apartment between 10:00 p.m. and midnight on April 5, 2013. While there was some other testimony that defendant was at Larkin's apartment on April 5, the record demonstrates that the shooting happened after midnight, and defendant's admissions that took place at Larkin's apartment happened around 4:00 a.m. the following day. Consequently, had the evidence been disclosed,

there is not a reasonable probability of a different outcome, and therefore defendant is not entitled to relief.[3]

The witness statement of Wallace also was not helpful to defendant. While defendant does allege that this statement was not provided by the prosecution, there is nothing in the record to support this assertion.[4] Additionally, the materiality of the statement is dubious. In the statement, Wallace says that on the night of the shooting, he heard a knock on his front door, and after opening it, saw the victim Johnson, who said "I've been shot." Defendant asserts that this is exculpatory because Johnson did not provide any names of the shooters or alternatively claim that he was shot during a robbery. Defendant's position is devoid of any merit or logic on its face. Obviously, someone shot Johnson. The fact that he did not describe the circumstances of the shooting during his final breaths to his neighbor is no reason to think that defendant or anyone else did not perform the crime. Hence, the evidence did not have any exculpatory value, and any *Brady* claim necessarily fails.

*Daniels*, 2016 WL 1125939 at *4-5 (footnotes in original).

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, Petitioner fails to allege facts showing that the police statements containing these three witnesses' statements were actually suppressed by the prosecution and not given to defense

_____

[3]Indeed, the jury was presented with this information. Larkin testified that, while Brown and Abrams were present, defendant was not at the apartment on the evening of April 5.

[4]Notably, defendant provided copies of the police reports that contained the statements by Brown, Abrams, and Wallace. Defendant does not explain how he came into possession of them if the prosecutor did not initially provide these statements. Indeed, the prosecution provided a proof of service that indicates that it provided discovery materials to defendant, which included "police narrative reports."

34

counsel. To be sure, Brown's and Abrams' statements are part of a report that includes Charona Williams' statement and the prosecution's proof of service indicates that they turned over police narrative reports. Petitioner does not indicate when or how he obtained the police reports containing the statements if not from the prosecution at the time of trial. Conclusory allegations, without evidentiary support, are insufficient to justify habeas relief. *Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. June 14, 2007); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient basis for an evidentiary hearing in habeas proceedings).

Second, none of the statements exonerate Petitioner or are particularly favorable to the defense. While Brown and Abrams both stated that they were at Ricky Larkin's residence between 10:00 p.m. and midnight on April 5, 2013 and did not mention Petitioner being present, they were not at Larkin's residence during the early morning hours on April 6, 2013, they did not witness the crime, and they were not at Larkin's residence after the crime occurred. While Wallace (and his son) reported that the victim came to the door and said that he had been shot, Wallace offered no other information about the crime. The fact that the victim did not elaborate on the circumstances of the shooting was not exculpatory, favorable to the defense, nor otherwise material to the case.

35

Third, Petitioner fails to show that there is a reasonable probability that the statements would have affected the outcome at trial. The testimony from Thompson and Williams provided substantial evidence of Petitioner's guilt and the allegedly undisclosed reports did not concern the circumstances of the crime, exculpate Petitioner, nor provide an new avenue of defense (other than possibly impeaching when Petitioner was at Larkin's residence). Petitioner fails to establish a violation of his constitutional rights or, more aptly, that the Michigan Court of Appeals' decision was unreasonable. Habeas relief is not warranted on this claim.

### 4.   Ineffective Assistance of Counsel Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to investigate his case and present an adequate defense at trial. In particular, he asserts that counsel should have called his mother to testify at trial and should have interviewed and presented Ricky Smith to testify at trial. Respondent contends that this claim is partially procedurally defaulted and that it lacks merit.

As previously discussed, the Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel at trial. To establish that trial counsel was ineffective, a habeas petitioner must prove that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. A reviewing court's scrutiny of counsel's performance

36

is highly deferential and there is a strong presumption that trial counsel exercised reasonable professional judgment. *Id.* at 689-90; *see also Harrington*, 562 U.S. at 105. A habeas petitioner is only entitled to relief if he or she can show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

As to the duty to investigate, it is well-settled that defense counsel must conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary. *Wiggins*, 539 U.S. at 522-23; *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning . . . guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). That being said, decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy. When making strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23. The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. Mar. 18, 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

The Michigan Court of Appeals denied relief on this claim finding that

Petitioner failed to establish that counsel was ineffective under the *Strickland* standard. The court explained in relevant part:

> Defendant claims that counsel's performance was constitutionally deficient because he failed to investigate and call defendant's mother as a witness, who supposedly would attest that defendant was with her until at least 10:30 p.m. on April 5, 2013. But who to call as a witness is a matter of trial strategy, which we will not second guess. *People v. Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). At the outset, with no evidentiary hearing, there is nothing on the record that indicates how defendant's mother would have testified at trial. Accordingly, his claim of ineffective assistance fails for the failure to establish the necessary factual predicate. *People v. Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Moreover, as noted above, the murder did not occur until after midnight, so even if the jury was presented with the "fact" that defendant was with his mother until 10:30 p.m., there was not a reasonable probability that there would have been a different outcome, given defendant's admissions and the damning testimony from Thompson and Williams.
>
> Defendant also claims that his trial counsel was constitutionally deficient by not interviewing Smith. However, there is nothing on the record to indicate that counsel did not attempt to interview Smith. Furthermore, in Smith's affidavit that defendant produced on appeal, Smith simply avers that defendant was not with Smith at any time on April 5, 2013. Again, the crimes with which defendant was convicted occurred on April 6, 2013. Smith, who pleaded guilty to his role in the murder, omitted any reference in his affidavit to being with defendant on April 6, which was the critical time period, and the jury surely would have viewed this as a glaring omission. In brief, if counsel had produced Smith for trial and Smith only testified, consistent with his affidavit, then there would not have been a reasonable probability that the jury's verdict would have been different. Thus, any claims of ineffective counsel based on the failure to investigate and/or call Smith as a witness necessarily fails.
>
> Defendant also argues that his trial counsel was ineffective because he failed to present an adequate defense. Defendant states that counsel

failed to challenge the prosecutor's case by failing "to attack [the] necessary elements of the offenses charged" and failing to assert that defendant was not present at the crime. To the extent that this claim is based on counsel's failure to produce Brown, Abrams, Wallace, and Smith as witnesses, the claim fails for the reasons provided previously. Additionally, to the extent that the claim is based on counsel's general failure "to attack [the] necessary elements of the offenses," defendant provides no further argument on what counsel either did inappropriately or should have done. Accordingly, the issue is abandoned. . . .

*Daniels*, 2016 WL 1125939 at \*5-6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. In this case, the record indicates that trial counsel sufficiently investigated potential witnesses and made strategic decisions about which witnesses to present at trial. While Petitioner contends that counsel should have called his mother as a witness and that she would have testified that he was at home with her until 10:30 p.m. on the April 5, 2013, he fails to present an affidavit from her or other evidence to support this assertion. As noted, conclusory allegations are insufficient to warrant federal habeas relief. *Cross*, 238 F. App'x at 39-40; *Workman*, 178 F.3d at 771; *see also Washington*, 455 F.3d at 733.

Additionally, counsel may have reasonably decided not to call Petitioner's mother as a witness due to credibility concerns, *see, e.g., Stadler v. Berghuis*, 483 F. App'x 173, 176-77 (6th Cir. June 5, 2012) (counsel's decision not to pursue an alibi defense was reasonable given concerns about family members' credibility), and the

fact that her testimony would not have provided Petitioner with an alibi given that the crime occurred during the early morning hours on April 6, 2013. The fact that counsel's strategy was unsuccessful does not mean that counsel was ineffective. *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (an ineffective assistance of counsel claim "cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

With respect to Ricky Smith, the record is unclear whether trial counsel attempted to interview him or was otherwise aware of his possible testimony as set forth in his affidavit. If counsel was aware of such potential testimony, he may have reasonably decided not to call Smith as a witness because Smith states that he was not with Petitioner on April 5, 2013, but does not discuss April 6, 2013 – when the crime occurred – in his affidavit. Similarly, if counsel was unaware of such potential testimony because he failed to interview Smith, Petitioner cannot establish that he was prejudiced by counsel's conduct given that Smith's affidavit only concerns April 5, 2013 and not April 6, 2013. Smith also does not indicate in his affidavit that he would have been willing to testify on Petitioner's behalf at the time of trial. Petitioner was not deprived of a substantial defense based upon counsel's conduct in not producing these potential witnesses.

Petitioner also alleges that trial counsel failed to sufficiently contest the elements of the offenses and to argue that he was not present at the crime and was

40

actually innocent. Such a claim is belied by the record. The record indicates that trial counsel challenged the prosecution's case, presented a defense witness, and made reasonable arguments in support of the defense case. Petitioner's assertions to the contrary are speculative and conclusory. He offers no specific factual or legal arguments that would have been beneficial to his defense. As noted, conclusory allegations are insufficient to warrant federal habeas relief. *Cross*, 238 F. App'x at 39-40; *Workman*, 178 F.3d at 771; *see also Washington*, 455 F.3d at 733. Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on this claim.

**V.    Conclusion**

For the reasons stated, the Court concludes that Petitioner's habeas claims lack merit and that he is not entitled to relief. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this

standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Having conducted the requisite review, the Court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right as to his habeas claims. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court concludes that an appeal from the Court's decision cannot be taken in good faith. *See* Fed. R. App. P. 24(a). Accordingly, the Court **DENIES** Petitioner leave to proceed in forma pauperis on appeal. This case is **CLOSED**.

**IT IS SO ORDERED**.

Dated:  June 8, 2020                              s/Paul D. Borman
                                                              Paul D. Borman
                                                              United States District Judge